UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2025 MAY 14 PM 1:05

CLERK

BY_____ KP
       DEPUTY CLERK

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | No. 2:24-cr-00113 - 1 |
| ) | |
| MICHAEL ROBISTOW ) | |
| Defendant. ) | |

# ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO SUPPRESS STATEMENTS MADE AND EVIDENCE SEIZED
(Doc. 20)

The government charges Defendant Michael Robistow ("Robistow" or "Defendant") with unlawful possession of a firearm in violation of 18 U.S.C. § 922(g)(1). This statute prohibits an individual who has been convicted of an offense punishable by imprisonment for a term exceeding one year from possessing a firearm. Defendant filed a Motion to Suppress asking the court to suppress statements he made as well as evidence seized from his vessel. (Doc. 20.) The government opposes the motion. (Doc. 22.) An evidentiary hearing was held on the motion on March 17, 2025. The government is represented by Assistant United States Attorney Joshua Banker and Assistant United States Attorney Wendy L. Fuller. Defendant is represented by Devin T. McKnight, Esq.

**I. Factual Findings**

Based on the testimony and exhibits admitted at the hearing, the Court finds as follows:

On June 9, 2024, the United States Coast Guard, while patrolling Lake Champlain, approached the vessel "Sonata" to conduct a safety inspection. A safety inspection involves Coast Guard officers boarding a vessel to check for safety equipment, including life jackets and life rings. The Coast Guard boat was staffed by four individuals, including Petty Officer Andrew Conway,

Petty Officer Jacob Range, Petty Officer Jacob Ricci, and Fireman Apprentice Riley Thompson. The boat itself was marked with "U.S. Coast Guard." The members were dressed in uniform, a personal flotation device, and a gun belt which includes a Glock pistol, magazine carrier, handcuff carrier, handcuff key carrier, pepper spray, and a baton.

As the Coast Guard approached the Sonata, Petty Officer Conway told the two individuals on the Sonata, Michael and Carolyn Robistow, that members of the Coast Guard were going to board the vessel to complete a safety inspection. Petty Officer Conway and Petty Officer Range boarded the Sonata and asked if there were any weapons on board. This is a routine question asked at the beginning of an inspection and is done for officer safety. Robistow indicated there were firearms on board. When asked for their location, Robistow replied they were in a safe in the stateroom of the vessel. Petty Officer Conway told Robistow not to go to the stateroom while they were on board.

Petty Officer Conway obtained Robistow's license along with the vessel's documentation and provided them to Fireman Apprentice Thompson. As part of the safety inspection, Petty Officer Conway asked Robistow for his navigation rules book. Robistow indicated it was in the forward cabinet next to the helm in the cabin. He further stated he could not go to the cabinet because there was a gun in it. Petty Officer Conway went to the cabinet and observed a loaded Glock pistol. Petty Officer Conway did not find a navigation rules book. Petty Officer Conway issued Robistow a warning for failing to have the required navigation rules book. He and Petty Officer Range then disembarked the Sonata.

While the safety inspection was occurring, Fireman Apprentice Thompson contacted the National Targeting Center ("NTC") to obtain information about the operators. The NTC is an agency in Texas that the Coast Guard contacts by telephone to "run for any wants or warrants."

2

Fireman Apprentice Thompson was advised the NTC needed additional information to identify the operator and requested the last four digits of his social security number. While Petty Officers Conway and Range were conducting the safety inspection, Fireman Apprentice Thompson asked Robistow for this information. Robistow provided it.

Once Fireman Apprentice Thompson relayed this information to the NTC, he was told the operator did not have any outstanding warrants. Fireman Apprentice Thompson was told, however, that Robistow had previously been convicted of two felonies, including one for assault and one for battery. This information was not accurate. Robistow has one prior felony conviction from North Carolina. He was convicted of felony possession of stolen property in 1994.

By the time Fireman Apprentice Thompson obtained the inaccurate information from the NTC, Petty Officers Conway and Range were disembarking the Sonata. After the Coast Guard boat pulled away from the Sonata, Fireman Apprentice Thompson told Petty Officer Conway what he had learned from the NTC. Upon hearing this information, Petty Officer Conway reached out to Petty Officer Steven Morrissey, who was on board a different Coast Guard vessel. The two Coast Guard vessels came together, and Petty Officer Conway and Petty Officer Morrissey spoke. The decision was made to reboard the Sonata to investigate a prohibited person being in possession of a firearm. Petty Officer Morrissey was to be the boarding, or lead, officer, while Petty Officer Conway was the cover officer.

The Coast Guard vessel approached Robistow's boat. The blue lights on the Coast Guard vessel were activated, and the siren was sounded for "a little bit just to get attention." The Coast Guard members were dressed in the same manner as they were for the first boarding. Petty Officer Morrissey made contact with Mrs. Robistow, asking her to lower their speed as they needed to speak to them. Robistow's boat stopped. Petty Officer Morrissey told Mrs. Robistow they had a

couple of follow-up questions and would be coming aboard. He asked her if she and her husband could meet them on the back deck of the boat.

Petty Officer Morrissey observed Robistow descend the ladder from the top bridge where he had been operating the boat. During his descent, Robistow's shirt came up, and Petty Officer Morrissey could see Robistow's waistband. He did not observe any bulges or other area where Robistow may have had a weapon.

When the Coast Guard officers and the Robistows met on the Sonata, Robistow expressed concern as to why their boat was being reboarded by the Coast Guard. Petty Officer Morrissey introduced himself and indicated he had some questions about information they learned after disembarking the last time. Petty Officer Morrissey frisked Robistow. There is no evidence Mrs. Robistow was subjected to a frisk. Petty Officer Conway had Mrs. Robistow accompany him toward the front of the boat for the purpose of separating her from Robistow.

Once separated and in the rear of the vessel, Petty Officer Morrissey asked Robistow if he had ever been arrested. Robistow answered he had, for a misdemeanor thirty years ago. In response, Petty Officer Morrissey asked him if there were any other arrests, and Robistow responded there were no others. Petty Officer Morrissey then asked Robistow if there were firearms on the vessel. Robistow replied there were two pistols and a rifle. Robistow indicated the second pistol was in the stateroom of the vessel and the rifle was in the same room in a wardrobe cabinet. Petty Officer Morrissey told Robistow he was being detained. Petty Officer Morrissey asked Petty Officer Conway for assistance in placing a life jacket on Robistow and placing him in handcuffs. Robistow was handcuffed with his hands behind him. Petty Officer Morrissey acknowledged it was inappropriate to have Robistow handcuffed in the back given that they were on open water on a choppy day. Robistow was seated on the back deck of the boat.

Petty Officer Morrissey went to speak to Mrs. Robistow while Petty Officer Conway stayed with Robistow. Mrs. Robistow told Petty Officer Morrissey the location and make and model of the firearms on board. She confirmed their travel plans to Petty Officer Morrissey and directed Petty Officer Morrissey to the firearms. Petty Officer Morrissey collected each weapon. Ammunition was also located.

Meanwhile, Petty Officer Conway told Robistow to stay in the back of the boat. While there, Robistow repeated to Petty Officer Conway that he was charged with a misdemeanor thirty years ago for stolen goods. This was not in response to any questioning by Petty Officer Conway.

After Petty Officer Morrissey located the three firearms, he had Robistow move into the cabin of the boat. There was stormy, rainy weather, and the waves were about two to three feet high. Petty Officer Morrissey contacted his superiors. He also placed a call to the NTC himself, to inquire about the Robistows' criminal histories. Petty Officer Morrissey learned from the NTC that Robistow had a felony conviction out of North Carolina for possession of stolen goods. This was a conviction from the 1990s. He was further told that Robistow had a felony conviction in California for assault in the early 2000s.

While Robistow was seated in the cabin of the boat, and without prompting from any Coast Guard official, Robistow stated that it was only a felony twenty years ago. When Robistow said this, Petty Officer Morrissey then engaged with Robistow, stating words to the effect of, "When we were outside, you said it was a misdemeanor." In response to this statement, Robistow replied, "No, it was a felony."

After speaking with his superior officers, the decision was made that Robistow was not going to be arrested at that time, but the firearms were going to be seized. The Coast Guard directed that the Sonata be brought to a marina in Colchester, Vermont. Robistow remained in

handcuffs while another Coast Guard official boarded the Sonata to take command of it and maneuver the vessel to dock. When the Coast Guard member approached the narrow entrance to Malletts Bay, he requested that Robistow be removed from handcuffs so Robistow could navigate and dock the vessel.

After the boat was docked, Petty Officer Morrissey approached Mrs. Robistow. Because Mrs. Robistow indicated the firearms were hers, Petty Officer Morrissey told her they would be seizing the firearms and she could contact the Coast Guard station in Burlington in a couple of days. Robistow was standing next to Mrs. Robistow while this information was being conveyed. He stated that he was confused about what was going on and why this was happening. Petty Officer Morrissey replied that they received "intel" that he was a convicted felon and that it is a violation of federal law for him to be "around firearms." In response, Robistow replied that he was informed by his lawyer that in the state of Texas one is allowed to have firearms or one's spouse is allowed to have firearms when one is a convicted felon if the weapons are on one's property and Texas recognizes both house and vessel as property. The interaction between Robistow and the Coast Guard ended at that point.

The next day, on June 10, 2024, the Coast Guard returned to the Sonata and conducted an additional search. During this search, Coast Guard officials discovered a bag of ammunition in the wardrobe cabinet where the rifle was located, underneath a wood board that could be removed.

**II. Legal Analysis**

*A. Suppression of the Firearms Evidence*

Defendant argues the reboarding of the Sonata was done without probable cause or reasonable and articulable suspicion of wrongdoing and consequently asks the court to suppress all physical evidence gathered from the vessel. The Government responds that the Coast Guard

had at least reasonable suspicion, and likely probable cause, to reboard the vessel based on the information the Coast Guard received regarding Defendant's prior conviction, Defendant's admission there were firearms on board, and the observation of a firearm.

The Fourth Amendment of the United States Constitution recognizes "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. "As this language indicates, 'the ultimate measure' of the constitutionality of a government search or seizure is 'reasonableness.'" *United States v. Bailey*, 743 F.3d 322, 331 (2d Cir. 2014) (quoting *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 652 (1995)). "It is fundamental that governmental searches and seizures without warrant or probable cause are per se unreasonable under the Fourth Amendment unless they fall within one of the Amendment's few established and well-delineated exceptions." *United States v. Streifel*, 665 F.2d 414, 419-20 (2d Cir. 1981). One such exception is an investigatory stop. *Terry v. Ohio*, 392 U.S. 1, 22 (1968).

Investigatory stops, or so-called *Terry* stops, permit law enforcement to conduct a brief detention of a person for investigatory purposes absent a showing of probable cause. *United States v. Fiseku*, 915 F.3d 863, 870 (2d Cir. 2018). The brief investigatory stop is permissible only if law enforcement is "'aware of specific articulable facts, together with rational inferences from those facts that reasonably warrant suspicion' that the individual is, was, or is about to be engaged in criminal activity." *Streifel*, 665 F.2d at 421 (citation omitted). "This standard is less stringent than probable cause, but it too is 'an objective standard,' requiring a 'reasonable and articulable suspicion.'" *Id.* (quoting *Terry*, 392 U.S. at 21 and *Reid v. Georgia*, 448 U.S. 438, 100 (1980)). "[L]egitimate investigatory stops cannot be made completely at random . . . ." *Id.* (citing *Delaware v. Prouse*, 440 U.S. 648, 654 (1979)).

In this case, Defendant initially agreed that the reboarding of the vessel was an investigative stop. (Doc. 20 at 7.) Defendant asserted that it was not supported by reasonable and articulable suspicion because the information upon which law enforcement relied to reboard the Sonata was inaccurate in that he did not have two prior felony convictions. In a subsequent filing, however, Defendant argued the reboarding was a *de facto* arrest, requiring probable cause. (Doc. 25 at 2.)

When a seizure occurs absent a warrant, the Government bears the burden of establishing that the seizure did not violate the Fourth Amendment. *United States v. Herron*, 18 F. Supp. 3d 214, 221 (E.D.N.Y. 2014) (citations omitted). In this case, the Government acknowledges the information relied upon by the Coast Guard leading up to and during this encounter was erroneous. (Doc. 22 at 19.) Robistow does not have two prior felony convictions, one for assault and one for battery, as conveyed by Fireman Apprentice Thompson. Robistow also does not have two felony convictions as conveyed by the NTC to Petty Officer Morrissey. The Government argues, however, that the seizure is still permissible as it was a reasonable mistake of fact and Robistow does, in fact, have one prior felony conviction. (*Id.* at 20.)

"To be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them 'fair leeway for enforcing the law in the community's protection.'" *Heien v. North Carolina*, 574 U.S. 54, 60-61 (2014) (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)). "[S]earches and seizures based on mistakes of fact can be reasonable." *Id.* "The limit is that 'the mistakes must be those of reasonable men.'" *Id.* at 61 (quoting *Brinegar*, 338 U.S. at 176).

The goal of the exclusionary rule is to deter police misconduct. *Herring v. United States*, 555 U.S. 135, 143 (2009). "[E]vidence should be suppressed 'only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search

8

was unconstitutional under the Fourth Amendment.'" *Illinois v. Krull*, 480 U.S. 340, 348-49 (1987) (quoting *United States v. Peltier*, 422 U.S. 531, 542 (1975)). The exclusionary rule does not apply when law enforcement officers act in "objectively reasonable reliance" on a database, court or computer record, even when that database, court or computer record provides faulty information. *See Herring*, 555 U.S. at 142 (citing *United States v. Leon*, 468 U.S. 897, 922 (1984)); *Arizona v. Evans*, 514 U.S. 1, 14 (1995).

In this case, the Coast Guard relied on information that was provided to them by the NTC. Petty Officer Morrissey testified that the NTC is an agency in Texas which Coast Guard members would call on the phone to determine if an individual had any "wants or warrants." He had never personally received incorrect information from the NTC. There is no evidence in the record regarding the NTC's use of or access to individuals' criminal history checks. The statute authorizing the NTC is 6 U.S.C. § 211(g)(4)(A) and its duties are enumerated in 6 U.S.C. § 211(g)(4)(C). The statute does not offer further information regarding the NTC's access to individuals' criminal histories, rather than "wants and warrants." Moreover, inconsistent information regarding Robistow's criminal history was coming from the NTC, as highlighted by the differing information given to Fireman Apprentice Thompson and Petty Officer Morrissey. In sum, it is unclear to the court whether it was "objectively reasonable" to rely on this information.

The exclusionary rule, however, is intended to deter law enforcement misconduct. Where exclusion does not contribute to the goal of deterring law enforcement misconduct, exclusion is not appropriate. *See Evans*, 514 U.S. at 13-14; *United States v. Calandra*, 414 U.S. 338, 348 (1974). In this case, if law enforcement had confirmed Robistow's criminal history before reboarding the vessel, as suggested by Defendant, the police would have found a felony conviction

rendering him ineligible to possess a firearm. In other words, proper police work would have found a felony conviction.

An analogous situation arises when police make a mistake as to the law. A mistake of law made by law enforcement does not automatically render a traffic stop *per se* unreasonable. *United States v. Delfin-Colina*, 464 F.3d 392, 399 (3d Cir. 2006). "Instead, a mistake of law is only unreasonable when the officer does not offer facts that objectively show that the identified law was actually broken." *Id*. For example, where "an objective review of the record evidence establishes reasonable grounds to conclude that the stopped individual has in fact violated the traffic-code provision cited by the officer, the stop is constitutional even if the officer is mistaken about the scope of activities actually proscribed by the cited traffic-code provision." *Id*. In other words, "[a] stop is lawful despite a mistake of law . . . if an objectively valid basis for the stop nonetheless exists." *United States v. Walters*, 563 F. Supp. 2d 45, 49 (D.D.C. 2008) (citation omitted), *aff'd in part*, 361 F. App'x 153 (D.C. Cir. 2009).

Given that a stop premised upon a mistake of law is permissible in the Fourth Amendment context when, despite the mistake, there is a valid basis for the stop, it seems that a mistake of fact would be comparably treated in light of the underlying purpose of the exclusionary rule. Although the second boarding of Defendant's vessel was premised upon two felony convictions that did not exist, Defendant did indeed have a felony conviction. The reality of Defendant's felony conviction along with the presence of firearms on the vessel satisfy the requirements of the Fourth Amendment. While the court does not find the second stop, by itself, constituted a *de facto* arrest, even if it did, it was supported by probable cause. The court finds that the Coast Guard lawfully boarded Defendant's vessel. Defendant conceded that, if the second boarding was lawful, there

would be no basis to suppress evidence of the firearms and ammunition found on the Sonata. Accordingly, Defendant's motion to suppress the evidence seized is DENIED.

### B. Suppression of Defendant's Statements

Defendant also seeks suppression of statements made by him after the Coast Guard reboarded his vessel. Defendant alleges these statements were taken in violation of the Fifth Amendment. "[W]hen an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized." *Miranda v. Arizona*, 384 U.S. 436, 478 (1966). The Government "may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id.* at 444. Such procedural safeguards "are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation." *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980). In this context, interrogation refers to any questioning reasonably likely to elicit an incriminating response. *United States v. Yago*, No. 06-CR-16-1, 2007 WL 1555775, at *3 (D. Vt. May 16, 2007) (citing *Innis*, 446 U.S. at 291). One such procedural safeguard includes the recitation of one's *Miranda* rights prior to any questioning by law enforcement. *See Berkemer v. McCarty*, 468 U.S. 420, 428-29 (1984); *United States v. Ali*, 68 F.3d 1468, 1472 (2d Cir. 1995) (citing *Miranda*, 384 U.S. at 444). "Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement." *Miranda*, 384 U.S. at 479. "But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him." *Id.*

11

To determine whether statements made by Defendant should be suppressed, the court must first consider if, and when, he was taken into custody. To assess whether an individual is in custody for purposes of *Miranda*, the Second Circuit applies a two-step objective analysis. *See United States v. Newton*, 369 F.3d 659, 672 (2d Cir. 2004). The court should consider "whether a reasonable person would have thought he was not free to leave the law enforcement encounter . . . [and if so], whether 'a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest.'" *United States v. Mastroianni*, 20-CR-00575, 2022 WL 17404783, at *4 (S.D.N.Y. 2022) (quoting *United States v. Belitz*, No. 21-CR-00693, 2022 WL 205585, at *2 (S.D.N.Y. Jan. 24, 2022)). "[T]he ultimate inquiry is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322 (1994) (second alteration in original) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)).

In determining whether a suspect is in custody, courts should consider the totality of the circumstances. *See Tankleff v. Senkowski*, 135 F.3d 235, 244 (2d Cir. 1998). Factors to consider include "whether a suspect is or is not told that she is free to leave; the location and atmosphere of the interrogation; the language and tone used by the police; whether the suspect is searched, frisked, or patted down; and the length of the interrogation." *Id.* (citations omitted). Another factor to consider is the extent to which an individual's freedom of movement is restrained, which includes the use of handcuffs and the number of agents involved. *United States v. Patterson*, 25 F.4th 123, 140-41 (2d Cir. 2022) (citation omitted). This is an objective assessment of the circumstances, and the suspect's subjective belief is not relevant. *United States v. Faux*, 828 F.3d 130, 135 (2d Cir. 2016). The subjective belief of the law enforcement official is relevant to the determination only if the belief "manifested to the individual under interrogation and would have

affected how a reasonable person in that position would perceive his or her freedom to leave." *Stansbury*, 511 U.S. at 325.

Here, Robistow's vessel was subject to a routine safety inspection by the Coast Guard. Shortly thereafter, the Sonata was stopped a second time by the Coast Guard vessel carrying four law enforcement officials. The Coast Guard vessel was sounding its siren and had its blue lights activated as it approached the Sonata once more. The Coast Guard told the Robistows they needed to reboard the vessel and directed the Robistows to stop. No reasonable person would have felt free to leave this second encounter. This, however, does not end the analysis. To constitute "custody," the extent of the restraint on Robistow's freedom of movement must be of a sufficient degree to resemble a formal arrest.

Ultimately, this degree of restraint was present here. Before the second boarding of the Sonata, Petty Officer Morrissey indicated to Mrs. Robistow they had a couple of follow-up questions and requested that both Mr. and Mrs. Robistow meet them in a specific location on the Sonata. Coast Guard officials did not tell Defendant that he was not under arrest. The officer with whom he had communicated during the safety inspection was no longer in charge. Robistow immediately raised his concern as to why the Coast Guard stopped the vessel a second time. Although Petty Officer Morrissey had not observed any weapons on Robistow, he frisked him. He did not frisk Mrs. Robistow. If there was a sincere concern for officer safety because of the presence of firearms, all parties on the vessel would have been subject to a quick search for weapons.

The officer who was in charge, Petty Officer Morrisey, initially stayed with Defendant while the other officer separated him from Mrs. Robistow. After frisking him and separating him from the only other person on the vessel, Petty Officer Morrissey asked pointed questions of

Defendant about his prior arrest history. An objective person in Defendant's position would have felt he was the target of an investigation. *See Newton*, 369 F.3d at 672. It was at this point that a reasonable person would have felt that his freedom of movement had been curtailed comparable to that of an arrest. *See Stansbury*, 511 U.S. at 322. Defendant was in custody and therefore entitled to be advised of his *Miranda* warnings prior to any questioning by law enforcement. *See Ali*, 68 F.3d at 1472. When Petty Officer Morrissey asked Defendant about his arrest history, he subjected him to custodial interrogation. Absent Defendant being advised of his *Miranda* warnings, these answers must be suppressed.

Petty Officer Morrissey next asked Defendant about the presence and location of firearms on board. The Government asserts that Robistow's answer to this question is admissible, even if he was in custody, because it was "necessary questioning." (Doc. 22 at 13.) It is true that "[n]ot all questioning of a suspect by the police amounts to interrogation. Some 'question[s] [are] necessary to secure their own safety or the safety of the public.'" *United States v. Familetti*, 878 F.3d 53, 57 (2d Cir. 2017) (second and third alterations in original) (quoting *New York v. Quarles*, 467 U.S. 649, 658-59 (1984)). Nevertheless, this exception does not apply here. Defendant was isolated and unable to obtain any firearms on board. Mrs. Robistow was also on board and able to provide this information. As a result, such questioning of Defendant was not necessary and, because he was not advised of his *Miranda* warnings, Defendant's answers must be suppressed.

Once Defendant provided Petty Officer Morrissey with the location of the weapons, Defendant was handcuffed. When that occurred, there is no doubt that Robistow remained in custody. Not all statements made while in custody, however, are subject to suppression. "Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence." *Miranda*, 384 U.S. at 478; *see United States v. Miller*, 382 F. Supp. 2d 350, 370

(N.D.N.Y. 2005) ("Nothing in the Fifth Amendment prohibits the police from merely listening to volunteered statements, and then using those statements at trial." (quoting *Edwards v. Arizona*, 451 U.S. 477, 485-86 (1981))). Similarly, spontaneous utterances need not be suppressed. *Yago*, 2007 WL 1555775, at *3 (citing *Stanley v. Wainwright*, 604 F.2d 379, 382 (5th Cir. 1979)).

While Defendant was seated on the back deck with Petty Officer Conway, he stated, without being asked any questions, that he was charged with a misdemeanor thirty years ago for stolen goods. This is a spontaneous statement not subject to the requirements of *Miranda*. *See id.* It will not be suppressed.

Similarly, while Defendant was seated in the cabin of the vessel in handcuffs, he made a statement that his prior conviction was only a felony twenty years ago. This was a spontaneous utterance not made in response to a custodial interrogation and will not be suppressed. *See id.*; *United States v. Henderson*, 770 F.2d 724, 728 (8th Cir. 1985) (noting voluntary conversations normally attendant to arrest and custody do not require *Miranda* warnings). In response, Petty Officer Morrisey commented that Defendant had previously said it was a misdemeanor. "Interrogation includes not only express questioning, but also 'its functional equivalent,' which the Supreme Court defines as 'any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *United States v. Bethea*, 191 F. Supp. 3d 249, 258 (E.D.N.Y. 2016) (quoting *Innis*, 446 U.S. at 301). Further, "a *Miranda* violation occurs only when [a] 'suspect's incriminating response was the product of words or actions on the part of the police that they should have known were reasonably likely to elicit an incriminating response.'" *Id.* at 258-59 (quoting *Innis*, 446 U.S. at 302). Law enforcement has a duty to refrain from speech which they should know is reasonably likely to elicit an incriminating response. *United States v. Heatley*, 994 F. Supp. 475, 477 (S.D.N.Y. 1998); *see*

*Innis*, 446 U.S. at 301. Here, the follow-up statement by Petty Officer Morrisey was the functional equivalent of interrogation as it was reasonably likely to elicit an incriminating response. *See Bethea*, 191 F. Supp. 3d at 258; *see also United States v. Chandler*, 164 F. Supp. 3d 368, 387 (E.D.N.Y. 2016) (explaining police officer's unprompted question regarding whether defendant wanted his cell phone was incriminating when cell phone located among other illicit items); *United States v. Zamora*, 42 F. Supp. 3d 397, 401 (N.D.N.Y. 2014) (noting defendant's response to law enforcement's inquiry of whether defendant could "help" law enforcement was reasonably likely to elicit incriminating response); *United States v. Carr*, 63 F. Supp. 3d 226, 238 (E.D.N.Y. 2014) (finding officer's questions regarding suspect's traveling companions reasonably likely to elicit incriminating response). Accordingly, Defendant's response that it was a felony is also suppressed.

Finally, Defendant seeks to suppress the statement he made to law enforcement after the vessel had docked in Malletts Bay. Once moored, Petty Officer Morrisey approached Mrs. Robistow to convey that the Coast Guard would be seizing the firearms. Defendant was standing next to Mrs. Robistow during this exchange and stated he was confused about what was going on and why this was happening. Petty Officer Morrisey replied they received intel that Defendant was a convicted felon and that it was a violation for Defendant to be "around firearms." Defendant replied he was told by his lawyer that, in Texas, one is allowed to have firearms or one's spouse is allowed to have firearms when one is a convicted felon if the weapon is on one's property. When Defendant made this statement, he was not in handcuffs and was free to leave. The statement was

not made in response to a question by law enforcement. Therefore, the statement was not the product of a custodial interrogation and will not be suppressed.

### III. Order

For the foregoing reasons, Defendant's Motion to Suppress Statements Made and Evidence Seized (Doc. 20) is hereby GRANTED in part and DENIED in part.

DATED at Rutland, in the District of Vermont, this 14th day of May 2025.

Mary Kay Lanthier
United States District Judge